STATE OF NORTH CAROLINA v. PERRIE DYON SIMPSON

No. 142A85

(Filed 7 July 1987)

### 1. Criminal Law § 75.1— delay in setting bond—subsequent confession—admissible

The trial court in a murder prosecution did not err by ruling that defendant's confession was admissible and entering judgment on his guilty pleas where defendant was arrested in Guilford County on an unrelated Guilford County warrant shortly after 9:00 p.m.; taken to the Reidsville Police Department at approximately 9:30 p.m.; taken before a magistrate in Reidsville shortly after 11:15 p.m.; the magistrate advised defendant that bond would not be set because no letter of transmittal recommending the amount of bond or a court date accompanied the Guilford County warrant; and defendant was taken to the Greensboro Police Department at about 1:30 p.m., where he confessed after questioning. Even assuming that the Reidsville magistrate denied bail in violation of N.C.G.S. § 15A-511(e), any deviation from lawful conduct does not appear to have been willful or extreme, suppression of defendant's confession would not significantly tend to deter future violations, and nothing in the record indicates that the officer's reliance on the magistrate's ruling or the ruling itself was not in good faith.

### 2. Arrest and Bail § 9— murder—setting of bail delayed—no constitutional violation

The temporary denial of reasonable bail to defendant in a murder prosecution did not violate the Eighth Amendment to the U.S. Constitution or Art. I, § 27 of the North Carolina Constitution where, although the magistrate may have erred by referring defendant's case to another judicial officer for the setting of bail rather than setting reasonable bail himself, the error did not make defendant's temporary further confinement an unreasonable seizure or "wrongful confinement" in any constitutional sense.

### 3. Criminal Law § 75.2— confession—not the product of fear

The confession of defendant in a murder prosecution was not the product of fear and therefore inadmissible where defendant was repeatedly given *Miranda* warnings; was alert, responsive, and appeared to understand his rights on each occasion; repeatedly waived those rights; there was evidence that defendant was not deceived about the nature of the crimes under investigation; he was provided food and drink and allowed to attempt to communicate with his father; two officers went to search for defendant's father when he could not be reached by telephone; the evidence did not indicate that the officers even informed defendant that they had found his fingerprints at the scene of the crime; the twenty-one-year-old defendant was not a juvenile; and the record did not indicate that defendant was interrogated for an unusually long time. An officer's comparison of the polygraph test which defendant had agreed to take to a snake who would bite a person who lied and the officer's advice to defendant not to take the test if he was lying did not amount to a threat or coercion.

4. **Criminal Law § 102— capital case—sentencing phase—only one defense counsel permitted to argue**

   The trial court erred in the sentencing phase of a murder prosecution by refusing to allow more than one of defendant's attorneys to participate in the final argument to the jury.

   Justice MARTIN dissenting in part.

   Justice MEYER joins in the dissenting opinion.

APPEAL by the defendant from judgments sentencing him to death and to imprisonment for consecutive terms of forty years and three years entered on 12 March 1985 by *Rousseau, J.,* in Superior Court, ROCKINGHAM County. Heard in the Supreme Court on 10 February 1987.

*Lacy H. Thornburg, Attorney General, by Joan H. Byers, Special Deputy Attorney General, for the State.*

*Ann B. Petersen for the defendant appellant.*

MITCHELL, Justice.

The defendant Perrie Dyon Simpson, pled guilty to one count of first degree murder, one count of robbery with a dangerous weapon and one count of conspiracy to commit murder. After his guilty pleas were entered, a jury was empaneled in accord with the requirements of N.C.G.S. § 15A-2000(a) for purposes of determining the defendant's punishment for first degree murder. After hearing evidence in the sentencing proceeding, the jury recommended that the defendant be sentenced to death. On 12 March 1985, judgments and commitments were entered sentencing the defendant to death for the offense of first degree murder, imprisonment for forty years for the offense of robbery with a dangerous weapon and imprisonment for three years for conspiracy to commit murder. The defendant appealed the judgment and sentence of death for first degree murder to this Court as a matter of right. His motion to bypass the Court of Appeals on the appeal of the judgments for robbery with a dangerous weapon and conspiracy to commit murder was allowed by this Court on 6 February 1986.

The defendant contends *inter alia* on appeal that the trial court erred by holding that his confession was admissible in the cases against him, because it was the product of his being held

unlawfully in custody and because it was involuntary. We conclude that the defendant's confession was properly received in evidence and reject this contention. As a result we hold that there was no error in the trial or judgments against the defendant for robbery with a dangerous weapon and conspiracy to commit murder. We also hold that the conviction of the defendant for first degree murder was without error.

The defendant also contends that the trial court erred during the sentencing proceeding in the first degree murder case by allowing only one of his counsel to participate in the defendant's final argument to the jury. We find this contention to be meritorious. Accordingly, we remand the first degree murder case to the Superior Court, Rockingham County for a new sentencing proceeding and resentencing according to law as prescribed in capital cases.

A complete review of the evidence introduced at trial is unnecessary to an understanding of those issues we deem it necessary to reach and decide. Some of the evidence for the State tended to show that Reverend Jean Ernest Darter, a ninety-two-year-old retired Baptist minister, was found dead in his home on the evening of 28 August 1984. He had been tied to a bedpost at the foot of his bed by a belt which was wrapped around his neck. Both of his arms had been slashed open. His head was bloated and his face was covered with blood. There were numerous cuts and bruises on his head, and his left cheek bore an imprint that matched the bottom of a broken Tab bottle lying on the bed. Blood and fragments of glass were in the victim's eyes. A bloody razor blade lay near his right hand. Certain items were missing from the home.

Expert medical testimony tended to show that any of three major areas of trauma suffered by the victim could have been life threatening, but that the victim's death was due to ligature strangulation caused by the belt around his neck. The victim's death by strangulation occurred over a period of five or six minutes or longer, depending upon the amount of force used during the process of strangulation. The victim would have lost consciousness within three to five minutes after his breathing was stopped by strangulation.

Fingerprints were found in the Darter home on a hall telephone, in the bedroom and in the kitchen. Some of the fingerprints found matched those of the defendant, Perrie Dyon Simpson. Others matched the fingerprints of the defendant's girlfriend, Stephanie Eury.

On 21 September 1984, the defendant was arrested on a warrant for an assault in Greensboro which was unrelated to the crimes for which the defendant stands convicted. After advising the defendant of his rights, the arresting officers briefly questioned him about the unrelated assault. They then began to discuss the Darter murder with him. The defendant initially denied any knowledge of the Darter murder. The officers temporarily ended questioning of the defendant after he agreed to take a polygraph test. Upon having the polygraph procedures explained to him and being told that the machine would reveal any lying on his part, the defendant said that the machine would show that he was lying and that there was something that he needed to tell the officers.

Shortly thereafter, the defendant was again advised of his rights. He then gave a statement in the nature of a confession indicating that he and Stephanie Eury had gone to Reverend Darter's home on 26 August 1984 at Stephanie's suggestion on the pretext that they were travelers who needed help. Reverend Darter gave them food and money at that time and allowed them to use the telephone in his home. After leaving the Darter home, the defendant and Stephanie Eury decided to go back and rob Darter.

The defendant said that, on the evening of Monday, 27 August 1984, he and Stephanie Eury left the Eury home and began to plan the robbery and murder of Darter. The defendant stated that: "Stephanie said if we go in there and rob the man we can't let him live and I said that is the truth." They then went to the Darter home and, after making sure that no one could see them, knocked on the door. Reverend Darter let them in. When Darter attempted to call the police to help Simpson and Eury, the defendant Simpson pulled Darter away from the telephone. He told Eury to cut the phone cord, which she did. Eury ran to the living room and pulled the drapes, while the defendant held Darter down on the bed in the bedroom. Eury began to ransack the residence for valuables to steal. When she brought food to the bed-

room to show to the defendant, he told her to look for money. He continued to hold Darter on the bed and told Darter, "I want some money or else." Simpson stated that Reverend Darter said that he had no money and to go ahead and kill him, he was going to Heaven. Simpson stated that: "The preacher was smiling as he told me to kill him because he was going to Heaven and this made me mad."

The defendant Simpson stated that he called to Eury to check the bedroom for money. He grabbed a belt from the footboard of the bed and looped it around Reverend Darter's neck. He held the belt tightly around the victim's neck with his right hand while he went through items on the bed with his left hand and "told the preacher that he better tell me where some more money was but the preacher could not talk as he was choking." The belt around the victim's neck broke, and Simpson grabbed a thicker leather belt from the footboard and looped it around the victim's neck, pulling it tight.

The defendant stated that he called to Eury "to bring me something in the bedroom to kill this preacher with." When the items Eury brought the defendant to kill the victim with proved unsatisfactory, he had her hold the belt and pull it tighter around the victim's neck, while he went to the kitchen "and looked around for some device to beat the old preacher and finish him off." Having found a full sixteen ounce soft drink bottle, Simpson returned to the bedroom. He and Eury then pulled together to tighten the belt around the victim's neck. Simpson then hit the victim in the face with the soft drink bottle three times, at which point it broke.

The defendant stated that he tied the end of the belt to the footboard of the bed and went to the bathroom of the home and got a razor blade. During this time Eury continued to search the house and gather up more items. Simpson cut both of the victim's arms, while Eury gathered up items to be stolen and put them in a grocery bag and a plastic laundry basket. They then cut off the lights in the home and left with the items they had stolen.

After the defendant confessed, warrants were issued charging him with first degree murder, robbery with a dangerous weapon, and conspiracy to commit murder. Additional facts are discussed where pertinent at later points in this opinion.

[1] By his first assignment of error, the defendant contends the trial court erred by entering judgment as to each of the three charges against him, because his confession was inadmissible as evidence. Although the defendant pled guilty to each of the charges before us on this appeal, the question of the admissibility of his confession as evidence supporting his convictions for each of those charges is properly before us for review. N.C.G.S. § 15A-979(b) (1983).

The trial court conducted a pretrial *voir dire* hearing on the defendant's motion to suppress his confession. At the conclusion of that hearing, the trial court made findings and conclusions based upon competent evidence of record. These included *inter alia* that: Jean Ernest Darter was killed in his home on 26 August 1984. Officers of the Reidsville Police Department and the State Bureau of Investigation immediately began an investigation. They discovered that a long distance call had been made from the victim's residence to Ruby Locklear at a Greensboro residence on the day of the murder. Locklear told the officers that the defendant sometimes called her. A search of the victim's home revealed latent fingerprints on the victim's telephone which matched those of the defendant. The officers began a search for the defendant on 20 September 1984. At about that time they learned that a warrant for the defendant's arrest for simple assault in Guilford County was outstanding. The officers learned that the defendant at times came to the residence of his girlfriend's mother, Peggy Eury. Shortly after 9:00 p.m. on Friday, 21 September 1984, officers went to the Eury residence and were admitted by Peggy Eury. They found the defendant there and arrested him under authority of the Guilford County warrant for simple assault.

The defendant was taken to the Reidsville Police Department at approximately 9:30 p.m. The warrant was read to the defendant, and he was advised of his constitutional rights. The defendant signed a written waiver stating that he had read his rights, understood his rights, wished to talk to the officers without the presence of an attorney, and that no promises or threats had been made. The defendant did not have the odor of alcohol about him or appear to be under the influence of any impairing substance. He appeared alert and responsive to questions asked by the officers and to understand what he was saying and doing. The officers advised the defendant that they wanted to talk to him

about the Guilford County assault and other crimes, including a murder in Reidsville. The defendant told the officers that he knew nothing about the Reidsville murder other than what he had read in newspapers.

The officers called an off duty magistrate at 11:15 p.m. and asked him to come to the police station in Reidsville. At that time, they asked the defendant if he wanted anything to eat. He responded that he did, and a meal was ordered for him. Shortly thereafter, Magistrate R. J. Hudson arrived and was informed of the Guilford County warrant for the defendant for simple assault. The magistrate advised the defendant that bond would not be set because no letter of transmittal recommending the amount of bond to be set or a court date accompanied the Guilford County warrant. The magistrate informed the defendant that he was charged with simple assault and that the magistrate was sending him back to Guilford County for the setting of a proper bond.

The meal the defendant had requested was then brought to him. At approximately 12:47 a.m. on 22 September 1984, the defendant, accompanied by three officers, was taken in an automobile from Reidsville to Greensboro. They arrived at the Greensboro Police Department at about 1:30 a.m. At that time the defendant was told that he would go before a magistrate for a bond hearing and was asked if he wished to talk to the officers before going to the magistrate. The defendant asked if he could sign his own bond and was told that any such decision was for the magistrate. The defendant was told on several occasions that he could go before a magistrate before making any statement to the officers. He said that he would go ahead and talk to the officers.

One of the officers told the defendant that he thought the defendant knew more about the murder in Reidsville than he had told the officers previously. The defendant was then asked to take a polygraph test and agreed. The defendant was taken across a hall to the office of Lieutenant Davis, a lieutenant of detectives with the Greensboro Police Department at approximately 1:38 a.m. Lieutenant Davis advised the defendant of his constitutional rights and explained the polygraph test. He told the defendant that if he had anything to do with the murder, other than what he had told the officers previously, it would show up on the polygraph. The defendant then read and signed an agreement in-

dicating that he desired to take the polygraph test. Lieutenant Davis told the defendant that he would advise the defendant not to take the polygraph test if he had any knowledge about the murder. At that point, the defendant advised the officer that the test would show that he was lying. Throughout the procedure with Lieutenant Davis, the defendant never complained, never showed any indication that he was dissatisfied, and cooperated fully with the officers.

The defendant then asked to use the telephone and called a person "who appeared to be Ruby Locklear" and asked for his father. He was told that his father was not present. Lieutenant Davis then sent two police officers to look for the defendant's father. The defendant was offered a cup of coffee at that time. After getting the coffee, the defendant stated, "what I am about to tell you, you won't like." The defendant then signed a written waiver of his constitutional rights which were again explained to him by Lieutenant Davis.

At approximately 2:44 a.m. on 22 September 1984, the defendant gave his inculpatory oral statement in the nature of a confession. after giving his oral statement, the defendant was told that the officers wanted to take a written statement from him. The taking of a statement by the defendant which was reduced to writing by the officers commenced at about 3:00 a.m. and was completed at 5:38 a.m. The defendant was then taken before a magistrate in Greensboro and brought back to Reidsville where a warrant for his arrest for murder had been issued.

After making such findings of fact, the trial court concluded in pertinent part that:

Based upon the foregoing the Court concludes that the defendant was taken before Madistrate [sic] Hudson some time after 11:00 p.m., having been arrested about 9:30 p.m. And the Court finds this was not an undue delay.

The Court further concludes Magistrate Hudson exercised his judicial function and ordered that the defendant be taken to the magistrate in Guilford County.

The Court further concludes that once the defendant was taken to Guilford County sometime after 1:30 a.m. on September 21st [sic], that he was advised that he had the right to go

to the magistrate or talk and that the defendant waived his right to go before the magistrate and elected to talk.

The Court further concludes that the defendant's statement was freely and voluntarily given and knowingly, understandingly given. No promises or threats had been made to him and that under the totality of the circumstances it was not coercive but to the contrary, was freely and voluntarily and knowingly given after being advised of his constitutional rights.

The Court further concludes that even though Magistrate Hudson did not set bond while at the Reidsville Police Department that at that time there had been no prejudice to the defendant and that it was not until after the defendant waived his right to go before a magistrate that the defendant made any statement to the police officers.

Therefore, the Court concludes, that the statement given to the police officers in the Greensboro Police Department in the early morning hours of September the 21st [sic], 1984, are admissible in the trial of this case.

The defendant first argues in support of this assignment that the trial court erred in holding his confession admissible, because he was being held in custody unlawfully at the time he confessed. The defendant does not contend that the delay in bringing him before Magistrate Hudson was unreasonably long. Instead, the defendant argues that Magistrate Hudson was required under N.C.G.S. § 15A-511(e) to release the defendant or set reasonable bail when the defendant appeared before him at 11:54 p.m. on 21 September 1984. The defendant argues that had Magistrate Hudson done this, the defendant would have immediately effected his release from custody and would not have confessed. Therefore, the defendant argues that he was unlawfully in custody after his right to reasonable bail was denied at 11:54 p.m., and that his confession was *ipso facto* the result of such unlawful custody.

Assuming *arguendo* that Magistrate Hudson denied bail in violation of N.C.G.S. § 15A-511(e), the trial court was not required to suppress a voluntary confession given thereafter by the defendant. The statute itself does not so provide. *State v. Hines*, 266 N.C. 1, 11-12, 145 S.E. 2d 363, 370 (1965) (violation of N.C.G.S.

§ 15-47, a precursor to N.C.G.S. §§ 15A-501 and 511); *State v. Exum*, 213 N.C. 16, 22, 195 S.E. 7, 11 (1938) (violation of an earlier statute — ch. 257, Public Laws of North Carolina, 1937).

Further, any violation of Chapter 15A was not such "a substantial violation" as to require suppression of the defendant's confession under N.C.G.S. § 15A-974(2). *See State v. Reynolds*, 298 N.C. 380, 259 S.E. 2d 843 (1979), *cert. denied*, 446 U.S. 941, 64 L.Ed. 2d 795 (1980). In determining whether that statute requires suppression, the reviewing court must consider the importance of the interest violated, the extent of the deviation from lawful conduct and whether the violation was willful, as well as the extent to which suppression will deter future violations. N.C.G.S. § 15A-974(2) (1983). Although the interest involved here was important, any deviation from lawful conduct does not appear to have been willful or extreme, and suppression of the defendant's confession would not significantly tend to deter future violations. The defendant has conceded that he was fully advised of his constitutional rights at all pertinent times and was taken before Magistrate Hudson within a reasonable time. Magistrate Hudson did not deny the defendant bail, although his action in referring the question of proper bail to a magistrate in Guilford County — which we have assumed *arguendo* to be error — temporarily had that effect. Nothing in the record before us tends to indicate that the officers' reliance upon the magistrate's ruling or his ruling itself were not in good faith. Therefore, to suppress the confession in this case would not significantly tend to deter future violations of Chapter 15A.

[2]   The defendant argues that, nevertheless, the temporary denial of reasonable bail by Magistrate Hudson violated the eighth amendment to the Constitution of the United States and article I, section 27 of the Constitution of North Carolina. Holding him in custody thereafter, the defendant contends, was thus illegal. He argues that, as a result, suppression of his confession was required, because it was the result of an unreasonable seizure prohibited by the fourth amendment.

As authority for this argument, the defendant relies upon cases such as *Taylor v. Alabama*, 457 U.S. 687, 73 L.Ed. 2d 314 (1982), *Dunaway v. New York*, 442 U.S. 200, 60 L.Ed. 2d 824 (1979), and *Brown v. Illinois*, 422 U.S. 590, 45 L.Ed. 2d 416 (1975).

In each of those cases, the defendant was seized by police acting without a warrant or probable cause, and confessed shortly thereafter. The Supreme Court held in each case that the voluntariness of the confession for purposes of fifth amendment analysis was not controlling and that the confession must be excluded under the fourth amendment proscription of unlawful seizures. We conclude, however, that those cases do not imply that an otherwise voluntary confession must be suppressed as the fruit of an unreasonable seizure under the fourth amendment where the defendant has been arrested under a proper warrant but is temporarily denied the opportunity to post reasonable bail by a magistrate's good faith misinterpretation of law. *See Williams v. State*, 504 S.W. 2d 477 (Tex. Crim. App. 1974).

The defendant concedes he was taken before a judicial officer for the setting of bail within a reasonable time. While the magistrate may have erred at that point by referring the defendant's case to another judicial officer for the setting of bail rather than setting reasonable bail himself, the error did not make the defendant's temporary further confinement an unreasonable seizure or "wrongful confinement" in any constitutional sense. *See, e.g., United States v. Rose*, 541 F. 2d 750, 756 (8th Cir. 1976), *cert. denied*, 430 U.S. 908, 51 L.Ed. 2d 584 (1977) (defendant arrested without warrant retained in custody more than twenty hours without filing of formal charge in violation of statute requiring release if no charge brought within twenty hours of seizure). This contention is without merit.

[3] The defendant next argues in support of this assignment of error that his confession was the product of fear and, therefore, was involuntary and inadmissible. Specifically, the defendant argues that Lieutenant Davis who offered him the polygraph test did so in a manner which induced fear in the defendant causing his will to be overborne and resulting in his confession.

The evidence as to what occurred when Lieutenant Davis offered the polygraph test to the defendant was not in conflict. It tended to show that Davis advised the defendant fully of his constitutional rights, and that the defendant waived those rights orally and in writing and agreed to talk with Davis. Davis then asked the defendant whether he had ever taken a polygraph test and was told that he had not. Davis then conducted what he

described as the "pre-test interview" in which he explained to the defendant what would happen once he was connected to the machine. After telling the defendant of the machine's ability to detect physiological changes that occur if a person lies, Davis asked the defendant if he was afraid of snakes. The defendant said that he was. Thereafter, Davis told the defendant that for a person involved in the Darter murder, the questions asked during the exam "will become a snake," and, if the person lied, "the snake will bite them." Davis told the defendant that, for a person who had nothing to do with the Darter murder, the test would be like a "paper snake" and could do no harm.

Davis then gave the defendant a form to sign before the test was administered. He explained that the form was a disclaimer of liability, which meant the defendant could not sue the police department or Davis for damages arising from the test. Davis next told the defendant that, if Davis were the defendant's father or a defense attorney, he would tell the defendant, "if you are not telling the truth don't take a polygraph." The defendant looked at the polygraph machine and said it would show he was lying. He told Davis he needed to tell him something. The defendant then was given the opportunity to call his father. When he was unsuccessful in reaching his father, he was taken to another room where he was given a cup of coffee. Shortly thereafter, the officers again advised him of his constitutional rights. He waived them, gave his oral confession, then cooperated with the officers who reduced his confession to a writing which he signed.

The trial court made detailed findings, including that the defendant had been fully advised of his constitutional rights on several occasions prior to confessing, and had waived those rights on each occasion. The trial court found that the defendant had been given food and drink on more than one occasion prior to confessing. The trial court further found that during the "pre-test interview" with Lieutenant Davis concerning the polygraph test, the defendant never complained, never showed any indication that he was dissatisfied and cooperated fully. The trial court made findings to the effect that the defendant was alert and responsive and understood his situation at all pertinent times. The trial court's findings were supported by competent evidence. Based on its findings, the trial court concluded that

the defendant's statement was freely and voluntarily given and knowingly, understandingly given. No promises or threats had been made to him and that under the totality of the circumstances it was not coercive but to the contrary, was freely and voluntarily and knowingly given after being advised of his constitutional rights.

In the present case, the defendant conceded that the procedural requirements of *Miranda v. Arizona*, 384 U.S. 436, 16 L.Ed. 2d 694 (1966) were met. Therefore, the determination of whether the defendant's confession was voluntarily and understandingly made must be reached from a consideration of the entire record. *State v. Corley*, 310 N.C. 40, 311 S.E. 2d 540 (1984). We have rejected any absolute or per se rule requiring the exclusion of a defendant's confession as involuntary in all situations in which promises or threats are made to him. *Id.* at 47-48, 311 S.E. 2d at 544-45. *See State v. Richardson*, 316 N.C. 594, 342 S.E. 2d 823 (1986). To the contrary, we have indicated that courts must look to the totality of the circumstances in determining whether any such promise or threat induced hope or fear which in fact overcame the defendant's will and caused him to confess or, instead, whether the confession was understandingly and voluntarily given despite a promise or threat. *State v. Corley*, 310 N.C. at 47-48, 311 S.E. 2d at 544-45; *State v. Jackson*, 308 N.C. 549, 581, 304 S.E. 2d 134, 152 (1983).

In a *voir dire* hearing on the admissibility of a defendant's confession, the trial court must determine whether the State has borne its burden of establishing by a preponderance of the evidence that the confession was voluntary. *State v. Corley*, 310 N.C. at 52, 311 S.E. 2d at 547. The findings of the trial court are conclusive and binding upon appellate courts when supported by competent evidence of record. *Id.* However, the trial court's conclusions of law are fully reviewable. *Id.*

In the present case, there was evidence before the trial court during the *voir dire* that the defendant was repeatedly given the *Miranda* warnings by the officers. On each occasion he was alert, responsive and appeared to understand his rights as they were described to him. He repeatedly waived those rights. There was also evidence before the trial court tending to show that the defendant was not deceived about the nature of the crimes under

investigation. He was provided food and drink and allowed to attempt to communicate with his father. When the defendant was unable to locate his father by telephone, two of the officers went to search for him. The evidence did not indicate that the officers even informed the defendant that they had found his fingerprints at the scene of the crime. The twenty-one-year-old defendant was not a juvenile. The record did not indicate that he was interrogated for an unduly long period of time. In light of the totality of the circumstances, the trial court concluded that Lieutenant Davis' comparison of the polygraph test to a snake and his advice to the defendant not to take the test if he was lying did not amount to a threat or coercion.

Having thoroughly reviewed the evidence introduced during the *voir dire* hearing and the trial court's findings and conclusions, we conclude that the trial court's findings are supported by competent evidence, and the findings in turn support its conclusions. Accordingly, we hold that the trial court did not err when it concluded that the defendant's confession was voluntary and admissible as evidence with regard to each of the charges against him.

[4] The defendant also assigns error to the trial court's refusal to allow more than one of his attorneys to participate in the final argument to the jury at the conclusion of the sentencing proceeding. We find merit in this assignment.

In *State v. Gladden*, 315 N.C. 398, 421, 340 S.E. 2d 673, 688, *cert. denied*, --- U.S. ---, 93 L.Ed. 2d 166 (1986), we stated:

We construe N.C.G.S. § 84-14 to mean that, although the trial court in a capital case may limit to three the number of counsel on each side who may address the jury, those three (or however many actually argue) may argue for as long as they wish and each may address the jury as many times as he desires. Thus, for example, if one defense attorney grows weary of arguing, he may allow another defense attorney to address the jury and may, upon being refreshed, rise again to make another address during the defendant's time for argument.

In the present case, the trial court ruled at the conclusion of the sentencing proceeding that it would "allow the defendant to

have an opening argument by one attorney and the District Attorney to have one argument and the defendant to have the closing argument by one attorney." We indicated in *State v. Eury*, 317 N.C. 511, 516-17, 346 S.E. 2d 447, 450 (1986) that the teaching of *Gladden* was that, where the defendant is entitled to the final argument to the jury in a capital case,

> his attorneys may each address the jury as many times as they desire during the closing phase of the argument. The only limit to this right is the provision of N.C.G.S. § 84-14 allowing the trial judge to limit to three the number of counsel on each side who may address the jury.

The trial court erred in refusing to permit both counsel for the defendant to address the jury during the defendant's final argument. This deprived the defendant of a substantial right and amounted to prejudicial error. *State v. Eury*, 317 N.C. at 517, 346 S.E. 2d at 450. As a result the defendant is entitled to be resentenced at a new sentencing proceeding conducted according to the requirements of N.C.G.S. § 15A-2000. In fairness to the trial court we note that *Gladden* and *Eury* were not available to provide it with guidance here, as the defendant was sentenced prior to our decisions in those cases.

The defendant has presented numerous other assignments of error relating to the sentencing proceeding in the case in which he was convicted for first degree murder. As we have found prejudicial error in the sentencing proceeding in the murder trial, we remand the murder case to the Superior Court, Rockingham County, for a new sentencing proceeding and for resentencing. As the defendant's additional assignments involve matters which are not likely to arise during the next sentencing proceeding in the murder case, we find it unnecessary to reach or address them.

Case No. 84CRS9827—Conspiracy to Commit Murder—No Error

Case No. 84CRS9829—Robbery With a Dangerous Weapon— No Error.

Case No. 84CRS9828—First Degree Murder—Guilt Phase, No Error; Sentencing Phase, Remanded for Resentencing.

Justice MARTIN dissenting in part.

I concur in the majority opinion except for its holding that the trial judge committed prejudicial error by refusing to allow both of defendant's counsel to make final arguments. The ruling was erroneous, but defendant has failed to demonstrate prejudice. N.C.G.S. § 15A-1443(a) (1983).

The majority holds this "deprived the defendant of a substantial right and amounted to prejudicial error" citing *State v. Eury*, 317 N.C. 511, 346 S.E. 2d 447 (1986), a companion case to the instant appeal. In *Eury*, this Court did not hold that the trial judge's refusal to allow both counsel to make final arguments was prejudicial error per se. The Court only found it to be error and then applied a harmless error analysis, after which the Court determined that the error was prejudicial. *Eury*, 317 N.C. at 517, 346 S.E. 2d at 450.

Here, in Simpson's appeal, the majority has failed to make a harmless error analysis. For the reasons set forth here and in my dissenting opinion in *Eury*, 317 N.C. 511, 346 S.E. 2d 447, I respectfully dissent.

Justice MEYER joins in this dissenting opinion.