STATE OF NORTH CAROLINA v. PHILIP REID PAYNE, JR.

No. 510A89

(Filed 26 July 1990)

**1. Jury § 7.14 (NCI3d)— motion for clerk to record race of prospective jurors—motion not timely**

The trial court did not err in denying defendant's motion for the clerk to record the race of "prospective jurors" after they had been peremptorily excused and the jury had been selected, since it would have been inappropriate to have the clerk make that determination, and defendant should have made his motion prior to jury selection so that the court could have had each prospective juror state his or her race during the court's initial questioning.

**Am Jur 2d, Jury §§ 105, 173, 235.**

**2. Criminal Law § 62 (NCI3d)— defendant's request for polygraphic readout—denial proper**

The trial court did not err in denying defendant's request for "what the polygraph showed such as heart rate and so forth," since defendant's written motion for an order that the State provide him with the "results" of the polygraph was not sufficiently explicit to inform either the trial court or the prosecutor that defendant sought the actual polygraphic readout or polygram of defendant's physiological responses in addition to the report containing the questions asked and the end result of the examination, i.e., deceptiveness. N.C.G.S. § 15A-903(e).

**Am Jur 2d, Depositions and Discovery § 449.**

STATE v. PAYNE

[327 N.C. 194 (1990)]

3. **Criminal Law § 89.6 (NCI3d) — officers' knowledge of tape recording — failure to disclose — evidence excluded — subsequent evidence admitted — jury argument available**

Even if the trial court erred in refusing to allow defendant to present evidence tending to show that two law enforcement officers failed to disclose to either the prosecutor or defendant the existence of a tape recording of defendant's phone call to the county emergency medical services made shortly after the victim was shot, such error was not prejudicial where defendant had opportunities to cross-examine both officers regarding their knowledge of the tape, but chose not to do so; the jury heard one officer testify that he knew of no statements made by defendant other than those to law officers, an insurance agent, and members of the victim's family; the jury thereafter heard the same officer authenticate the tape recording of defendant's call to EMS; and defense counsel therefore was free to argue to the jury as a legitimate inference arising from the evidence that officers had not been candid about the fact that defendant had made a statement to EMS personnel.

**Am Jur 2d, Depositions and Discovery §§ 428, 429, 433.**

4. **Criminal Law § 1371 (NCI4th) — proportionality review — duty of Supreme Court only**

The trial court did not err in failing to perform a pretrial proportionality review, since that duty is reserved exclusively for the Supreme Court. N.C.G.S. § 15A-2000(d)(2).

**Am Jur 2d, Jury §§ 173-175.**

5. **Homicide § 17 (NCI3d) — defendant's failure to return to work after medical leave — evidence admissible to show motive**

Testimony by the human resources manager at the company where defendant had worked for five years concerning defendant's failure to return to work after a medical leave of absence was admissible as evidence of defendant's motive for killing his wife where, prior to the manager's testimony, the State had introduced evidence of defendant's statements to law enforcement officers that he had decided on the day of the murder to kill his wife in order, among other things, to "collect the insurance money, . . . and not work as much"; after the manager's testimony, the State presented evidence that at a family picnic just eight days before the shooting

defendant told two members of the victim's family, "I'll do anything to keep from going back to work"; and there was no evidence that defendant was fired from his job.

**Am Jur 2d, Homicide § 280.**

**6. Criminal Law § 73.3 (NCI3d) — statements made by murder victim — admissibility to show state of mind**

In a prosecution of defendant for the murder of his wife, the trial court did not err in allowing officers to testify concerning statements made by the victim and related to them by defendant, since the victim's statements to defendant were admissible as evidence of the victim's then existing state of mind; they tended to show that the victim felt her marriage was in trouble and had related her feeling to defendant; and such evidence was relevant to corroborate one of defendant's admitted motives for deciding to kill his wife — to "get out of the marriage." N.C.G.S. § 8C-1, Rule 803(3).

**Am Jur 2d, Homicide §§ 280-283.**

**7. Criminal Law § 75.7 (NCI3d) — statements made by defendant after polygraph exam — defendant not in custody — statements voluntary**

The trial court's findings were supported by evidence and those findings supported its conclusion that defendant's statements were understandingly and voluntarily made where officers visited defendant and asked him if he would submit to a polygraph examination, stating that taking the test would "clear up the matter and verify the truthfulness of his statements"; defendant agreed; he was transported to another town for the exam and seemed alert and relaxed; the SBI agent administering the exam advised defendant of his rights, told him he was not required to take the exam, that he could stop at any time, that he could consult with an attorney at any time, that he was not in custody, and that he was free to leave at any time; defendant stated that he wished to continue; after the exam defendant was again advised that he was free to leave; defendant replied that he wished to stay and continue; the SBI agent then told defendant that it was his opinion that defendant had lied; defendant remained silent for a period of time, then began making statements to the agent and another law enforcement officer; defendant never

indicated any desire to stop the examination, consult a lawyer, or leave; defendant never indicated in any way that he felt threatened or coerced; and at no time did the officers make defendant any promise, threat, offer of reward or other inducement for his statement.

**Am Jur 2d, Evidence §§ 543-554.**

APPEAL of right by the defendant pursuant to N.C.G.S. § 7A-27 from the judgment entered by *Lamm, J.,* in the Superior Court, BURKE County, on 16 June 1989, sentencing the defendant to life imprisonment for murder in the first degree. Heard in the Supreme Court on 9 April 1990.

*Lacy H. Thornburg, Attorney General, by Jane P. Gray, Special Deputy Attorney General, for the State.*

*Sam J. Ervin, IV and Robert C. Ervin for the defendant appellant.*

MITCHELL, Justice.

The defendant, Philip Reid Payne, Jr., was tried at the 30 May 1989 Criminal Session of Superior Court, Burke County, upon a true bill of indictment charging him with the murder of his wife, Pamela B. Payne. The jury found the defendant guilty of first-degree murder based upon the theory that the killing was premeditated and deliberate. At the conclusion of a separate sentencing proceeding under N.C.G.S. § 15A-2000, the defendant was sentenced to life imprisonment. On appeal the defendant brings forward several assignments of error. We conclude that the defendant received a fair trial free of prejudicial error.

The State's evidence at trial tended to show that on the afternoon of Monday, 31 October 1988, the defendant intentionally shot and killed his wife with a single blast from a .12 gauge shotgun that he had just finished cleaning. The defendant admitted that he had planned to kill his wife by staging a gun cleaning "accident," but claimed that at the last instant he realized that he could not carry out his plan; then the gun truly did fire accidentally.

Additional evidence will be discussed as it relates to the defendant's assignments of error, which we address seriatim.

**STATE v. PAYNE**

[327 N.C. 194 (1990)]

## I.

[1] The defendant first assigns as error the trial court's refusal to order the State to articulate race-neutral reasons for its peremptory excusals of black jurors from the petit jury, which the defendant contends violated his rights under both the Sixth Amendment to the federal constitution and article I, § 26 of our state constitution. At the conclusion of the jury selection process, after the twelve jurors who decided this case had been selected and two alternates were being selected, the defendant (who is white) objected to the State's use of peremptory challenges against black jurors. The defendant requested that the courtroom clerk record the race and sex of the "prospective" jurors who had already been seated or excused, but the trial court denied his request. The next morning, the defendant renewed his objection via a written motion for the clerk to record the race and sex of jurors. The motion was supported by an affidavit, subscribed by one of the defendant's attorneys, purporting to contain the name of each black prospective juror examined to that point, and whether the State had peremptorily excused, challenged for cause, or passed the prospective juror to the defense (the defendant says one black juror did sit on the trial jury). The trial court, viewing the affidavit's allegations as true, nonetheless ruled that the defendant had failed to make a prima facie showing of a substantial likelihood that the State was using its peremptory challenges to discriminate against black jurors. *See, e.g., State v. Mitchell*, 321 N.C. 650, 365 S.E.2d 554 (1988).

The Supreme Court of the United States has recently ruled that a white defendant "has standing to raise a Sixth Amendment challenge to the exclusion of blacks from his jury." *Holland v. Illinois*, 493 U.S. ---, ---, 107 L. Ed. 2d 905, 914, *reh'g denied*, --- U.S. ---, 108 L. Ed. 2d 650 (1990). We have not yet decided any similar question arising under our state constitution. However, we need not reach the constitutional issues presented by this assignment of error, as we are not presented with a record on appeal which will support the defendant's argument that jurors were improperly excused by peremptory challenges exercised solely on the basis of race.

By his motion, the defendant sought to have the clerk record the race of the seated jurors and those who had already been peremptorily excused. Regarding a similar proposed practice, we have previously held that:

STATE v. PAYNE

[327 N.C. 194 (1990)]

Although [having the court reporter note the race of every potential juror] *might* have preserved a proper record from which an appellate court could determine if any potential jurors were challenged solely on the basis of race, we find it inappropriate. To have a court reporter note the race of every potential juror examined would require a reporter alone to make that determination without the benefit of questioning by counsel or any other evidence that might tend to establish the prospective juror's race. The court reporter, however, is in no better position to determine the race of each prospective juror than the defendant, the court, or counsel. An individual's race is not always easily discernible, and the potential for error by a court reporter acting alone is great. As the trial court noted, "[The clerk] might note the race as being one race and in fact that person is another race. . . . [M]y observation has been you can look at some people and you cannot really tell what race they are." The approach suggested by the defendant would denigrate the task of preventing peremptory challenges of jurors on the basis of race to the reporter's "subjective impressions as to what race they spring from." *See Batson* [*v. Kentucky*], 476 U.S. [79,] 130 n.10, 90 L. Ed. 2d [69,] 109 n.10 (Burger, C.J., dissenting).

If a defendant in cases such as this believes a prospective juror to be of a particular race, he can bring that fact to the trial court's attention and ensure that it is made a part of the record. Further, if there is any question as to the prospective juror's race, this issue should be resolved by the trial court based upon questioning of the juror or other proper evidence, as opposed to leaving the issue to the court reporter who may not make counsel aware of the doubt. In the present case the defendant did not avail himself of this opportunity . . . .

. . . .

. . . Thus, the defendant has failed to demonstrate that the prosecutor exercised peremptory challenges solely to remove members of any particular race from the jury.

*State v. Mitchell*, 321 N.C. at 655-56, 365 S.E.2d at 557.

In the present case, the trial court stated that it would "not require the Clerk or the reporter or anybody else to view someone and determine their sex and race." The trial court noted, however,

that had the defendant made his motion prior to jury selection, the court would have had each prospective juror state his or her race during the court's initial questioning. This would have provided the trial court with an accurate basis for ruling on the defendant's motion, and would also have preserved an adequate record for appellate review. *See id.* Having not made his motion to record the race of prospective jurors until after the twelve jurors who actually decided his case had been selected, the defendant attempted to support his motion via an affidavit purporting to provide the names of the black prospective jurors who had been examined to that point. That affidavit, however, contained only the perceptions of one of the defendant's lawyers concerning the races of those excused — perceptions no more adequate than the court reporter's or the clerk's would have been, as we recognized in *Mitchell. See id.* For the reasons stated in *Mitchell*, we conclude that the trial court did not err by denying the defendant's motion for the clerk to record the race of "prospective jurors" after they had been excused and the jury had been selected. *See id.* For similar reasons, we also conclude that the record before us on appeal will not support the defendant's assignment of error. The defendant's assignment of error is overruled.

## II.

[2] The defendant next assigns as error the trial court's refusal to compel the State to disclose certain recorded measurements made during a polygraph examination of the defendant. On 15 November 1988 the defendant voluntarily submitted to a polygraph examination performed by an agent of the State Bureau of Investigation (SBI). After being told that certain answers he had given appeared to be deceptive, the defendant made inculpatory statements to law enforcement officers, which led to his immediate arrest. Throughout the investigation and trial, the defendant consistently contended that the shooting was accidental. It was not until after the polygraph examination that the defendant admitted planning to kill his wife. Even after making this admission, however, the defendant maintained his contention that the actual shooting was accidental, even though he had been planning to shoot his wife until shortly before the gun accidentally fired.

On 23 November 1988 the defendant requested voluntary discovery from the State, including discovery of "[a]ny results or reports of physical or mental examinations or of tests, measurements

or experiments" made in connection with the case. *See* N.C.G.S. § 15A-903(e) (1988). On 10 May 1989 the defendant moved to compel the State to "produce the purported results of the purported polygraph test allegedly administered to the defendant." After a hearing on that same date, Judge C. Walter Allen ordered the State to provide the defense with "the results of any polygraph tests administered to Philip Reid Payne, Jr." The State then provided the defendant with a copy of its "Polygraph Report" which contained, among other information, the opinion of the examiner that deception was indicated, and the three "relevant questions" which, in the examiner's opinion, were answered deceptively by the defendant. On 26 May 1989, four days before trial, the defendant moved for sanctions against the State, contending, as he does here, that the State failed to comply with Judge Allen's order by not providing him with the "results as to what the polygraph showed such as the heart rate and so forth." In his motion the defendant sought to have the statements he made after the polygraph examination suppressed at trial. Even the defendant's written motion for sanctions did not request that he be provided with "what the polygraph showed such as the heart rate and so forth"; he made that specific request for the first time orally at the motion hearing. The trial court denied the defendant's request for the physiological readout of the polygraph machine. Further, the trial court refused to order suppression of the defendant's statements as a form of sanction against the State.

The defendant argues that "the physiological measurements of Mr. Payne's heart and respiration rate made during the polygraph examination plainly constitute the results of a physical examination and a test or measurement made in connection with the case," and that he should have been provided those measurements pursuant to N.C.G.S. § 15A-903(e). The defendant correctly recognizes that polygraph evidence is inadmissible at trial. *State v. Grier*, 307 N.C. 628, 300 S.E.2d 351 (1983). He says that he sought these measurements, instead, as part of his challenge to the admissibility of the statements he made to law enforcement officers after the polygraph examination, as well as to challenge the credibility of those officers' testimony. The admissibility of those statements is raised in a separate assignment of error, which we address below.

We conclude that the trial court did not err in denying the defendant's request for "what the polygraph showed such as the heart rate and so forth." We are initially unable to say that the

STATE v. PAYNE

[327 N.C. 194 (1990)]

defendant's written motion for an order that the State provide him with the "results" of the polygraph examination was sufficiently explicit to inform either the trial court or the prosecutor that the defendant sought the actual polygraphic readout or "polygram" of the defendant's physiological responses, in addition to the report containing the questions asked and the end result of the examination, i.e., deceptiveness. This is particularly true in light of the fact that the purpose of discovery under our statutes is to protect the defendant from unfair surprise by the introduction of evidence he cannot anticipate. *State v. Stevens*, 295 N.C. 21, 243 S.E.2d 771 (1978); *State v. Thomas*, 291 N.C. 687, 231 S.E.2d 585 (1977). Therefore, there was no reason for the trial court or the prosecutor in this case to believe that the defendant sought the polygram, since, as we have pointed out in prior cases, such polygrams are particularly without value as evidence and are inadmissible. *See State v. Grier*, 307 N.C. at 643-45, 300 S.E.2d at 360-61 (quoting *United States v. Alexander*, 526 F.2d 161, 168 (8th Cir. 1975) ). For the same reason, we are unable to say that the trial court erred in denying the defendant's oral request, made four days prior to trial, by which the defendant appears to have sought the actual polygram. *See id*. The defendant's assignment of error is without merit.

## III.

[3] The defendant, by his third assignment of error, contends that the trial court erred by refusing to allow him to present evidence tending to show that two law enforcement officers failed to disclose to either the prosecutor or the defendant the existence of a tape recording of the defendant's telephone call to the Burke County Emergency Medical Services (EMS), made shortly after the victim was shot. We conclude that the trial court's ruling, if erroneous, was nonetheless harmless error.

The State's first witness at trial was Terry Houston, a Burke County EMS dispatcher, who testified to receiving an emergency telephone call on 31 October 1988 from the defendant. At that time, the defendant told Houston that "I was cleaning my gun, and it went off, and it shot my wife." SBI Agent John Suttle, the lead investigating officer for the SBI on the case, later testified during cross-examination by the defendant that he knew of no statements made by the defendant pertinent to the case other than statements made to law enforcement officers, an insurance

agent and members of the victim's family. Agent Suttle did not mention the telephone call to EMS, although he had obtained a copy of a tape recording of that call shortly after the shooting. The State presented no evidence that the conversation between Houston and the defendant had been recorded. Apparently, the prosecutor was not made aware of the fact that the defendant's call to EMS had been recorded until after jury selection, at which time he made the recording available to the defendant. The defendant, however, had already obtained a copy of the recording from Burke County EMS.

During his case-in-chief, the defendant sought to introduce evidence that both Agent Suttle and Captain Robin Dale of the Burke County Sheriff's Department had obtained copies of the tape early in the investigation, but that neither had informed the prosecutor of the tape or made it available to the defendant. During a voir dire examination, Agent Suttle testified that he had acquired a copy of the tape within a month after the shooting, but had not provided the tape to the prosecutor because "after Mr. Payne's statement that he gave to the investigating officers on November 15th, I didn't place a great deal of evidentiary value on the tape; therefore, I did not include it in the investigative file that went to the District Attorney's Office." Captain Dale likewise testified on voir dire that the Burke County Sheriff's Department had a copy of the tape, but did not inform the prosecutor of the tape's existence until after jury selection. The trial court sustained the State's objection to the introduction of the voir dire evidence as being irrelevant to the question of the defendant's guilt or innocence. The jury was returned to the courtroom and the defendant then called Agent Suttle to the stand. Suttle authenticated the tape recording, which was then played to the jury. The defense argued to the jury that the tape showed the defendant displaying an emotional state inconsistent with an intentional killing.

The defendant makes numerous arguments regarding why he should have been allowed to call the two officers as witnesses during his case-in-chief and question them regarding why they had not informed the prosecutor of the tape's existence. He contends that the officers' failure to inform the prosecutor of the tape-recording was an admission of the weakness of the State's case against him. He argues that such evidence tended to show the officers' bias and, if admitted, would have reduced the credibility of their testimony

which was before the jury. He argues that Agent Suttle's knowledge of the tape was inconsistent with his testimony that he knew of no statements made by the defendant pertinent to the case other than statements made to law enforcement officers, an insurance agent, and members of the victim's family. The defendant further argues that the trial court's denial of his attempt to elicit this evidence violated his compulsory process, confrontation, and due process rights under the federal constitution.

We note that during the State's case-in-chief, the defendant had opportunities to cross-examine both Agent Suttle and Captain Dale regarding their knowledge of the tape, but chose not to do so. Even assuming *arguendo* that the trial court erred, however, its error was harmless beyond a reasonable doubt. The jury heard one of the officers testify during the State's presentation of evidence that he knew of no statements made by the defendant other than those made to law enforcement officers, an insurance agent and members of the victim's family. Thereafter, during the defendant's presentation of evidence, the jury heard the same officer authenticate the tape recording of the defendant's call to the Burke County EMS. The tape itself was then played in its entirety for the jury. Therefore, counsel for the defendant was free to argue to the jury, as a legitimate inference arising from the evidence, that the officers had not been candid about the fact that the defendant had made a statement to EMS personnel. Counsel was also free to make reasonable arguments concerning the inferences the jury should draw from the defendant's statement to EMS personnel shortly after the killing, which statement the jury had heard in its entirety. Therefore, we conclude that the error complained of here, if error, was harmless beyond a reasonable doubt. This assignment of error is without merit.

IV.

[4] By his fourth assignment of error, the defendant argues that the trial court erred in failing to perform a pretrial proportionality review. The trial court had no authority to engage in proportionality review, since "[t]hat duty is reserved *exclusively* for this Court." *State v. Jackson*, 309 N.C. 26, 45 n.3, 305 S.E.2d 703, 716 n.3 (1983) (emphasis added); *see* N.C.G.S. § 15A-2000(d)(2) (1988). The defendant's assignment of error is overruled.

V.

[5] The defendant next assigns as error the trial court's admission of testimony concerning his failure to return to work at the Dana Corporation where he was employed as a machinist. At trial, Wilma Taylor, human resources manager for Dana, testified that the defendant had worked at Dana for five years prior to the shooting. For approximately two months before the shooting the defendant had been on medical leave, having suffered a back injury. He was scheduled to return to his second shift job at 3:00 p.m. on 31 October 1988, the day of the shooting. In response to the State's question, and over defense objection, Taylor testified that the defendant did not return to work on 31 October, and did not return to work after that date.

The defendant argues that Wilma Taylor's testimony regarding his failure to return to work was irrelevant, misleading to the jury, and unfairly prejudicial. We disagree. Taylor's testimony was admissible as evidence of the defendant's motive for killing his wife. Prior to Taylor's testimony, the State had introduced evidence of the defendant's statements to law enforcement officers that he had decided on the day of the murder to kill his wife in order to "collect the insurance money, get out of the marriage, pay the house off, get the children, *and not work as much*." After Taylor's testimony, the State presented evidence that at a family picnic just eight days before the shooting, the defendant told two members of the victim's family, "I'll do anything to keep from going back to work." Taylor's testimony was thus relevant evidence tending to corroborate one of the defendant's admitted motives at the time he decided to kill his wife.

The defendant argues that Taylor's testimony is not probative evidence of motive, as he actually did not return to work at Dana because he was fired after tools allegedly stolen from Dana were found at his home. The defendant's argument, however, is unsupported by record evidence. There is no evidence in the record before us to show that the defendant was fired from the Dana Corporation. The defendant's assignment of error is thus overruled.

VI.

[6] By his next assignment of error, the defendant contends that the trial court erred in allowing two law enforcement officers to testify as to statements made by the victim to the defendant,

who in turn related them to the officers. At trial, SBI Special
Agent Jonathan Jones testified that he had interviewed the defend-
ant on 15 November 1988. Over defense objection, Agent Jones
testified that the defendant told him

> That on Saturday, October 29, 1988, Pam started asking ques-
> tions like if Philip wanted out of the marriage, or if Philip
> may be fooling around on her, and why they did not fool around
> as much. On Monday, October 31, 1988, "I got up and decided
> I wanted out of the marriage. That if I shot and killed Pam
> I could collect the insurance money, get out of the marriage,
> out from under the house debt, and have the children. I would
> not have to work as much."

Immediately after the defendant made this statement to Agent
Jones, the defendant repeated his statement in the presence of
Burke County Sheriff's Detective Dean Lloyd. Detective Lloyd also
testified at trial, and related a substantially identical statement
by the defendant, also over defense objection.

The defendant contests the overall admissibility of his
statements to the two officers in a separate assignment of error,
which we address below. For purposes of this assignment of error
the defendant acknowledges that if otherwise admissible, the de-
fendant's statements to the officers are admissions of a party oppo-
nent, and thus admissible non-hearsay under Rule 801(d)(A) of the
North Carolina Rules of Evidence. N.C.G.S. § 8C-1, Rule 801(d)(A)
(1988). Nevertheless, the defendant specifically contests the ad-
missibility of the officers' testimony as to the *victim's* statements
to the defendant, which were related by the defendant to the of-
ficers; this testimony concerned the victim's questions to the de-
fendant as to whether he wanted "out of" their marriage, whether
he was having an affair, and why the couple did not "fool around"
as much as they apparently did at one time. The defendant initially
argues that the officers' testimony as to the victim's statements
was hearsay not within any exception to the hearsay rule. *See*
N.C.G.S. § 8C-1, Rules 801-05. Alternately, the defendant argues
that if the evidence was offered as non-hearsay, it was irrelevant
to any material issue at trial and inadmissible.

The State counters, and we agree, that the victim's statements
to the defendant were admissible as evidence of the victim's then
existing state of mind. N.C.G.S. § 8C-1, Rule 803(3). The victim's
statements tended to show that the victim felt the Paynes' mar-

riage was troubled and had related her feeling to the defendant. Such evidence was relevant to corroborate one of the defendant's admitted motives for deciding to kill his wife—to "get out of the marriage." The defendant's assignment of error is thus overruled.

## VII.

[7] The defendant's seventh assignment of error concerns the trial court's denial of his motion to suppress the statements he made to SBI Agent John Suttle and Burke County Sheriff's Detective Dean Lloyd on 15 November 1988. The defendant contends that the statements were involuntary, since they were obtained as a result of the defendant's hope of reward which was improperly induced by the State in a coercive atmosphere. We disagree.

At the voir dire hearing on the defendant's motion, three law enforcement officers testified regarding their contacts with the defendant leading up to his statements on 15 November 1988. Following the testimony of those officers and arguments by defense counsel, the trial court made certain findings of fact, which we summarize: On 8 November 1988 Agent Suttle and Detective Lloyd visited the defendant and asked him if he would submit to a polygraph examination. Agent Suttle told the defendant that taking the test would "clear up the matter and verify the truthfulness of his (the defendant's) statements." The defendant agreed to take the polygraph test. At that same meeting, Agent Suttle commented that the defendant's oldest daughter "bore quite a resemblance to her mother." Agent Suttle's remark did not appear to upset the defendant. On the morning of 15 November 1988, the defendant came to the Burke County Sheriff's Department and then rode with Agent Suttle and Detective Lloyd to the SBI office in Hickory. During the ride to Hickory, the defendant appeared relaxed and alert and did not appear to be under the influence of any impairing substance.

After arriving at the SBI office, the defendant was introduced to SBI Agent Jonathan Jones. Agent Jones took the defendant to the room where the polygraph examination was conducted. The examination room was approximately ten feet square, had no windows, and contained a desk and three chairs. Before starting the examination, Agent Jones advised the defendant of his rights regarding the polygraph examination. Agent Jones specifically advised the defendant that he was not required to take the examination and could stop at any point, that he could consult with an

attorney at any time before or during the questioning, that he was not in custody, and that he was free to leave at any time he wished. After being advised of his rights, the defendant stated that he wished to continue. Agent Jones then administered the examination to the defendant. The defendant was attached to the polygraph machine for twenty-three minutes, thirteen of which were occupied by the actual questioning.

After the examination, the defendant was again advised that he was free to leave. The defendant replied that he wished to stay and continue. Agent Jones then told the defendant that, in his opinion, the defendant had lied to him on the relevant questions. The defendant remained silent for a period of time, then began making statements to Agent Jones. After the defendant made incriminating statements to Agent Jones, Agent Jones asked Detective Lloyd to come into the examination room. Agent Jones summarized for Detective Lloyd what the defendant had just told him, then the defendant substantially repeated his prior statement for Detective Lloyd. The defendant was with Agent Jones from approximately 9:27 a.m. until 2:19 p.m. on 15 November, with Detective Lloyd also being present from approximately 12:55 p.m. until 2:19 p.m. There was no evidence that the defendant ever indicated any desire to stop the examination, consult with a lawyer, or leave; the defendant never requested food or drink; and the defendant never indicated in any way that he felt threatened or coerced. At no time on or prior to 15 November 1988 did the officers make the defendant any promise, threat, offer of reward or other inducement for his statement. .

Based upon its findings of fact, the trial court concluded that the defendant's statements had been freely and voluntarily made, after he had knowingly and intelligently waived his right to remain silent and right to counsel. The trial court further concluded that none of the defendant's constitutional rights were violated.

North Carolina law is well established regarding this Court's role in reviewing a trial court's determination of the voluntariness of a confession.

> Findings of fact made by a trial judge following a voir dire hearing on the voluntariness of a confession are conclusive upon this Court if the findings are supported by competent evidence in the record. No reviewing court may properly set

aside or modify those findings if so supported. This is true even though the evidence is conflicting.

*State v. Jackson*, 308 N.C. 549, 569, 304 S.E.2d 134, 145 (1983) (citations omitted). We have reviewed the hearing transcript and conclude that the trial court's findings are not only supported by competent evidence, they are essentially uncontroverted.

Given that the trial court's factual findings were supported by competent evidence, we must next determine whether the trial court's conclusions of law are supported by the findings. "The legal significance of the findings of fact made by the trial court is a question of law for this Court to decide." *Id.* at 582, 304 S.E.2d at 152 (citation omitted). "The North Carolina rule and the federal rule for determining the admissibility of a confession is the same. It is a rule or test of voluntariness in which the court looks at the totality of the circumstances of the case in determining whether the confession was voluntary." *Id.* (citing cases); *see State v. Corley*, 310 N.C. 40, 47-48, 311 S.E.2d 540, 545 (1984).

Given the factual findings before us, we detect no error in the trial court's conclusions. The defendant correctly recognizes that a confession is inadmissible if the State obtains the confession by promises or threats which induce hope or fear and in fact overcome the defendant's will. *State v. Simpson*, 320 N.C. 313, 325, 357 S.E.2d 332, 338-39 (1987), *cert. denied*, 485 U.S. 963, 99 L. Ed. 2d 430 (1988); *see State v. Fox*, 274 N.C. 277, 163 S.E.2d 492 (1968); *State v. Biggs*, 224 N.C. 23, 29 S.E.2d 121 (1944). However, no such promises or threats were made in this case. Agent Suttle's statement to the defendant that his taking the polygraph examination would "clear up and verify the truthfulness of his statement" meant just that. Had the defendant's responses not indicated deception, the examination would have tended to verify the defendant's prior statement, and the State's investigation "would probably have been ended" as Agent Suttle testified. Having reviewed the evidence, we conclude that the trial court's findings were supported by evidence, and that those findings in turn supported its conclusions. Given the totality of the circumstances, the trial court did not err in concluding that the defendant's statements were understandingly and voluntarily made. The defendant's assignment of error is overruled.

The defendant's remaining assignments of error relate to issues that the defendant recognizes have previously been decided by this Court contrary to his position, but which he nonetheless brings forward to preserve for further appellate review. As those issues have previously been decided by this Court contrary to the defendant's position, the defendant's related assignments of error are overruled.

For the foregoing reasons, we hold that the defendant received a fair trial free of prejudicial error.

No error.