*********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Holmes and the briefs and oral arguments before the Full Commission. The appealing party has shown good grounds to reconsider the *Page 2 
evidence and upon reconsideration, the Full Commission REVERSES the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS:
1. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction over this matter.
2. All parties are subject to and bound by the North Carolina Workers' Compensation Act.
3. All parties have been properly designated, and there is no question as to joinder or non-joinder of parties.
4. The Plaintiff sustained a compensable injury on August 13, 2005.
5. An employment relationship existed between the Plaintiff and the Employer-Defendant during some or all of the time period of the previous paragraph.
6. Defendants filed a Form 61 on or about August 31, 2006, which admitted that Employee-Plaintiff sustained a compensable injury by accident to his right thumb while playing professional football on August 13, 2005, but denied that Employee-Plaintiff was disabled and entitled to any indemnity compensation as a result of that injury by accident. Defendants filed a Form 28B on or about February 15, 2006.
7. On September 9, 2005, Employee-Plaintiff was terminated from the Employer-Defendant. On September 12, 2005, Employee-Plaintiff was paid an injury grievance settlement by the Employer-Defendant, in the amount of $97,058.82. That injury grievance settlement *Page 3 
reflected payment for eleven weeks of regular season pay, based on a season contract price of $150,000.00. Employee-Plaintiff's contract provided that he would be paid 1/17th of $150,000.00 for each game as he was not a member of the active/inactive roster. Pursuant to the revised NFL Collective Bargaining Agreement, the Defendants are entitled to a reduction of 1.5 weeks of any award to Employee-Plaintiff for each week Employee-Plaintiff received his salary pursuant to the injury grievance settlement. Thus, the Defendants are entitled to a reduction of 16.5 (11 x 1.5) weeks of any compensation awarded to Employee-Plaintiff for permanent partial impairment, temporary total or temporary partial disability.
8. The parties participated in a mediated settlement conference on June 29, 2007, that was unsuccessful. Neill Fuleihan served as the mediator for the parties. Following that unsuccessful mediation the Defendants made payment of the full mediator's fee, in the amount of $600.00, to Neill Fuleihan for his services as the mediator.
 *********** STIPULATED EXHIBITS
In accordance with North Carolina Workers' Compensation Rule 409(6), the parties stipulated to each of the following documents:
 1. Stipulated Exhibit #1
 (a) North Carolina Industrial Commission Forms.
 (b) Plaintiff and Defendants discovery responses.
 (c) Medical Records of the Employee-Plaintiff.
 (d) Carolina Panthers Personnel/Employment/Medical File.
 (e) Article LIV of the NFL Collective Bargaining Agreement.
 (f) Plaintiff's wage information from 2006 and 2007. *Page 4 
 2. Stipulated Exhibit #2
 (a) Videotape of Carolina Panthers vs. Washington Redskins, August 13, 2005.
 *********** ISSUES TO BE DETERMINED: 1. Plaintiff's contested issues to be tried at the hearing are as follows:
 a. Is the Plaintiff-Employee entitled to wage loss benefits under N.C. Gen. Stat. §§ 97-29, 97-30 and/or benefits under N.C. Gen. Stat. § 97-31, including medical compensation?
 b. What is the average weekly wage of the Plaintiff-Employee?
 2. Defendants' contested issues to be tried at the hearing were as follows:
 a. Is Plaintiff entitled to any additional compensation as a result of the August 13, 2005, injury by accident?
 b. Should Plaintiff's evaluation of his permanent partial impairment by Dr. Wallace Andrew on August 2, 2007, be considered as evidence given that Plaintiff did not undergo an initial evaluation for determination of his *Page 5 
permanent partial impairment by a treating physician prior to undergoing a second opinion evaluation?
 c. Should Defendants have to pay for the evaluation by Dr. Wallace Andrew given that Plaintiff did not seek preauthorization for the appointment, did not advise Defendants of the appointment prior to it taking place, and Plaintiff did not undergo an initial evaluation for determination of his permanent partial impairment by a treating physician prior to undergoing a second opinion evaluation?
 d. Should Plaintiff be made to come to Charlotte, North Carolina for an evaluation with Dr. Boatright, the physician who performed his surgery, at his own expense in order to be evaluated for an assessment of his permanent partial impairment rating, given that he did not comply with N.C. Gen Stat. § 97-27 when he presented for his evaluation with Dr. Andrew and did not allow the Defendants the right to have present at that evaluation a duly qualified physician of their choice?
 e. What is Plaintiff's permanent partial impairment?
 f. Are Defendants entitled to a credit for Plaintiff's portion of the mediator's fee paid by the Defendants following the unsuccessful mediation?
 g. What is Plaintiff's average weekly wage?
 ***********
Based upon the post-hearing stipulations, the competent evidence of record and the reasonable inferences flowing therefrom, the Full Commission enters the following additional:
 FINDINGS OF FACT
1. The Plaintiff is currently 29 years of age. He and his wife, Monique Floyd, have been married for over five years and currently reside in Bartow, Florida. Mrs. Floyd is a graduate of Florida State University.
2. The Plaintiff played football at Bartow High School from 1993-1997. Based on his football skills and ability in high school, he received a football scholarship to the University of Indiana and graduated in December 2001. *Page 6 
3. The Plaintiff played various positions during his college football career, including: defensive back, wide receiver, running back and defensive end.
4. The Plaintiff won the Hoosier Strength and Conditioning Challenge both in 1998 and 2001. This is an award presented to an athlete who is "pound for pound the strongest" and the best conditioned athlete on the field. In 2001, Plaintiff won the Ted Verlihay Award, given annually to the player that demonstrates the best mental attitude and loyalty to the Hoosier football program.
5. In 2002, Plaintiff made the New York Jets professional football team active 53 man roster in the National Football League ("NFL") as a rookie free agent. His primary position was cornerback; however, he also played on special teams such as the kick-off team and the team used to block extra points and field goals.
6. His contract with the New York Jets was for $225,000.00, payable in seventeen equal installments.
7. During or after the third game in the regular 2002 NFL season, a linebacker on the Jets' team was injured and the Jets needed to quickly add a new linebacker to the team. Because only 53 players are allowed on any active NFL roster, the Jets had to eliminate one active player to make room on the roster for another linebacker.
8. As a result, Plaintiff was released from the New York Jets.
9. He was quickly picked up by the Buffalo Bills in the same 2002 season and was on that team's active roster.
10. The Plaintiff signed a contract with the Buffalo Bills under which he would earn $225,000.00 for the 2002 season. *Page 7 
11. The Bills assigned Plaintiff to special teams where he was involved on the kick-off team, kick-off return team and punt team. Essentially, every time there was a change of possession he would come in the game.
12. In 2003, Plaintiff participated in organized team activities, mini-camps and training camps with the Buffalo Bills. However, following a groin injury, Plaintiff missed two games and was released from the Bills in September 2003.
13. During the same season, the Carolina Panthers contacted Plaintiff and he signed a contract with the Panthers in December for the 2004 NFL season and the 2004 NFL-Europe season.
14. NFL Europe is a developmental football program where players are sent to improve their abilities and gain more experience. The season typically runs ten weeks from April to June and his salary was approximately $1,000.00 per week.
15. In 2004, Plaintiff was the second defensive back picked at the NFL-Europe draft and played for the Cologne Centurions.
16. Although Plaintiff did not make the Carolina Panthers active roster in 2004, the Panthers asked him again to participate in NFL Europe, thereby allowing him to develop more field experience.
17. The Plaintiff had another successful season in NFL Europe and was under contract with the Carolina Panthers for the 2005 NFL season. Under the contract he would earn $305,000.00 per season, payable in seventeen installments, upon him making the active roster of 53 players. *Page 8 
18. In July and August 2005, Plaintiff participated in the Carolina Panthers training camp, earning $775.00 per week. He was doing well and was consistently making plays in practice. He was one of the top players in the number of pass break-ups and interceptions.
19. The Plaintiff was injured on August 13, 2005, during a preseason game against the Washington Redskins in Charlotte, North Carolina. The Plaintiff was lined up to attempt to block the opposing team's players during a punt return. On this particular play, Plaintiff attempted to jam the opposing player with the base of his hands.
20. A jam or block is when he would attempt to stop an opposing player, usually a wide receiver by using the base of his hand to absorb the brunt of the force used during the play.
21. While attempting to jam the opposing player, Plaintiff's right thumb was caught in the opposing player's shoulder pads. The right thumb was jerked backwards to such a degree that it touched the top of Plaintiff's right wrist, severely tearing the ulnar collateral ligament in his thumb.
22. The ulnar collateral ligament is one of the major stabilizing ligaments in the thumb and is part of the metcarpophalangeal (MP) joint.
23. Patrick M. Connor, MD, a team physician for the Carolina Panthers, examined Plaintiff on August 14, 2005.
24. The Plaintiff was diagnosed with a very obvious and unstable grade 3 ulnar collateral ligament injury to the MP joint of his right thumb. Such an injury is commonly known as a gamekeeper's thumb.
25. Gamekeeper's thumb is an injury to the thumb where the ulnar collateral ligament is torn off. Once it is torn, the thumb loses an extreme amount of strength. Without the ulnar collateral ligament, you can take your thumb and pull it back to your wrist. *Page 9 
26. Surgery was recommended to repair the ulnar collateral ligament in Plaintiff's right thumb.
27. Nevertheless, he attempted to play football with the injured thumb. Another top player, Ken Lucas, thought Plaintiff could still make the team and encouraged him to keep playing. However, he experienced significant pain every time he tried to jam an opposing player or hold the ball. He also had difficulty with his thumb frequently getting caught in other players' jerseys. These conditions substantially increased Plaintiff's pain and decreased his ability to play football at the level necessary to compete in the NFL.
28. On August 21, 2005, following a game against the New York Giants, Plaintiff contacted Dr. Connor and stated that due to the pain and instability of his thumb, he was unable to continue playing with his thumb in its current condition.
29. Dr. Connor referred Plaintiff to James Boatright, MD, a board-certified orthopaedic surgeon in Charlotte, North Carolina.
30. Dr. Boatright examined Plaintiff on August 23, 2005 and diagnosed his injury as a Stener lesion and tear of [the] ulnar collateral ligament and probably a partial tear of the volar plate as well, right thumb MP. Dr. Boatright also noted there was a degree of volar subluxation.
31. A Stener lesion is when the ulnar collateral ligament "flips out and gets caught out of its anatomical location."
32. Volar subluxation is a condition when the volar dorsol, the joint itself, has drifted down a little bit from its normal position. When the collateral ligament is torn, it allows the entire joint to drop down from its connection to the volar plate. Volar subluxation makes the joint incongruous to a degree, like a round peg in a square hole; it doesn't fit exactly right and over time could cause wear and tear ending up with some arthritic changes. *Page 10 
33. Dr. Boatright performed reparative surgery on Plaintiff's right thumb, collateral ligament and MP joint, on August 24, 2005. During the surgery, Dr. Boatright discovered a grade 3 ligament tear which required him to essentially sew the ligament back down to the bone.
34. A grade 3 ligament tear is a complete tear. In such a case, the ligament is avulsed, or flipped out, and lies back on top or outside the aponeurosis of the adductor so that it can't go back into its appropriate position and cannot heal with competence.
35. An injury settlement under the CBA is not a substitution for workers' compensation benefits and the NFL team is not allowed a full offset for these benefits. The team is allowed a partial credit of 16.5 weeks, based on eleven weeks of payments.
36. On September 2, 2005, nine days after surgery, Plaintiff was released from the Panthers team after he reached his injury settlement, pursuant to the Collective Bargaining Agreement (CBA).
37. Following his release from the Panthers, Plaintiff returned to his hometown of Bartow, Florida.
38. The Panthers referred Plaintiff to Brian A. Schofield, MD, an orthopedic surgeon in Sarasota, Florida, for post-op medical treatment and rehabilitation. Sarasota is about two hours away from Bartow, Florida. Four weeks after the surgery, on September 23, 2005, Plaintiff was examined by Dr. Schofield and was told that he was "well-healed" even though Plaintiff reported continued pain and stiffness.
39. Dr. Schofield recommended a physical therapy treatment plan which included gentle active range of motion exercises. The Plaintiff returned to Dr. Schofield on October 28, 2005 and November 23, 2005, at which time he was released. He was discharged by Dr. Schofield approximately three months after surgery. *Page 11 
40. Dr. Boatright disagreed with Dr. Schofield's treatment in that it is Dr. Boatright's typical protocol to keep the patient casted with no range of motion for six weeks; whereas Dr. Schofield had Plaintiff removing the cast and performing range of motion exercises within four weeks.
41. The type of motion test performed by Dr. Schofield was merely a quick exam to see if things appeared to be in considerably good condition from a functional standpoint. This type of test simply shows the thumb appears to be doing its major jobs.
42. To accurately measure joint range of motion a device called a goniometer is used. A goniometer measures angles and can make measurements necessary in determining impairment under AMA guidelines. To accurately measure grip and pinch, a device called a dynamometer is used.
43. Dr. Schofield admitted he did not perform an exam that would quantify an impairment rating and if he had, his notes would have been more detailed. Nor did Dr. Schofield use a goniometer or a dynameter in assessing Plaintiff's range of motion.
44. To stay in top shape, Plaintiff would work out with a younger acquaintance, Colin Moore, in his home town over holidays or whenever he was at home for an extended period of time.
45. Colin Moore is a football player at Nichols State who is currently training for the NFL. Mr. Moore knew of Plaintiff's NFL experience and asked if he could train with him. Aside from Plaintiff, Mr. Moore has frequently practiced with other NFL players, including other NFL defensive backs.
46. Mr. Moore and Plaintiff practiced together over forty times between 2002 and 2005. *Page 12 
47. During these practices they would perform defensive back and special team drills, such as backpedaling, throwing passes, catching passes and drills where they would jam each other.
48. Following the surgery, as he was preparing to play professional football again, Mr. Floyd was no longer able to catch the ball in the same manner as before. Often he would try to "body-catch" the ball instead of using the proper form to catch.
49. While Plaintiff was still a good athlete after the injury, he could not properly catch the ball or jam. To be a professional defensive back, these are necessary skills.
50. In January 2006, Plaintiff tried out for professional football at a lower level (arena football) with the Orlando Predators.
51. Before the try-out, on January 5, 2006, Craig Mintzer, MD, an orthopedist, performed the pre-season physical evaluation of Plaintiff for the Orlando Predators. Dr. Mintzer cleared Plaintiff to participate in arena football.
52. Although Plaintiff was "cleared to play arena football," this term did not relate to how well he could play nor as to whether he had healed to his pre-injury status.
53. Dr. Mintzer's notes do not contain any reference to Plaintiff's range of motion, nor do they indicate whether such a test was performed on Plaintiff.
54. Dr. Mintzer is not a hand expert.
55. Dr. Mintzer's examination of Plaintiff lasted approximately ten to fifteen minutes, during which time he performed a head to toe exam.
56. Assuming range of motion tests were performed by Drs. Schofield and Mintzer on Plaintiff's right thumb, such tests did not include measurements of degree of range of motion and were merely generalized tests. *Page 13 
57. Typically someone who undergoes a gamekeeper's thumb repair will have some limitation of motion six weeks after the surgical repair due to swelling and other issues.
58. Based upon the incomplete information gathered by Drs. Mintzer and Schofield, on January 2, 2008, Dr. Boatright could not make a determination as to permanent partial impairment.
59. Plaintiff was released from the team because of his limitations in grasping the football and inability to block or jam other players as a result of the impairment from the thumb injury sustained while working with the Carolina Panthers.
60. The Plaintiff did not sustain additional injuries or further injury to his thumb while trying out for the Orlando Predators.
61. The nature and severity of the injury sustained on August 13, 2005 was such that despite a lengthy period of rehabilitation, the injury was career ending.
62. Approximately one year after the injury, Plaintiff had not experienced substantial improvement in his range of motion and stiffness in his right thumb so he filed a Form 18: (Notice of Accident) on August 10, 2006.
63. On August 31, 2006, Defendants denied Plaintiff's August 13, 2005 claim by signing a Form 61, but admitted that he sustained a compensable injury to his right thumb during a professional football game on August 13, 2005.
64. At the request of Plaintiff, Wallace F. Andrew, MD, a board-certified orthopaedic surgeon and team physician for North Carolina State University, performed an independent medical evaluation (IME) of Plaintiff on August 2, 2007 to determine if a permanent-partial impairment rating existed. *Page 14 
65. Typically, Dr. Andrew performs IMEs at the request of an insurance carrier and not at the request of the injured party. His charge for the examination was $850.00
66. Dr. Andrew's IME consisted of a personal evaluation of Plaintiff's right thumb, an evaluation of Plaintiff's range of motion, a review of relevant x-ray films and a review of Plaintiff's medical records.
67. To determine range of motion, Dr. Andrew studies the arc of motion of the joint and how many degrees the joint can move.
68. The Plaintiff's MP joint had an arc of 30 to 53 degrees and his interphalangeal (IP) joint had an arc of 0 to 52 degrees. Thus, Plaintiff has a "much-much less of an arc of motion" of his MP joint than normal.
69. While the IP joint was not operated on as a result of the injury, it was immobilized when it was placed in the cast during Plaintiff's rehabilitation. Joints adjacent to the injured body part are almost always injured to some degree as a result of immobilization. Thus, Plaintiff now experiences stiffness of the IP joint as well as the MP joint.
70. The Plaintiff sustained a twenty (20%) permanent-partial impairment of the right thumb as a result of the August 13, 2005 injury and subsequent surgery.
71. To give an accurate permanent disability rating, a physician must allow the patient to fully heal and complete rehabilitation prior to determining a rating. Six months is a minimum amount of time to wait prior to assessing a rating.
72. Under the American Medical Association (AMA) Guide to theEvaluation of Permanent Impairment, an authoritative text used by physicians in determining impairment ratings, "the medical evaluation is the basis for determination of permanent anatomic impairment of the upper extremities. It must be accurate, objective and well-documented." *Page 15 
73. The evaluations of Drs. Mintzer and Schofield were neither detailed nor well-documented in order to assess permanent disability. Neither physician used a goniometer to measure Plaintiff's range of motion.
74. Dr. Andrew carries a goniometer in his pocket and would challenge an evaluation that merely states that "range of motion is normal".
75. Currently, Plaintiff has stiffness and a decreased range of motion of his right thumb. He can no longer grasp objects very well and he can no longer lift heavy objects. Extended use of his thumb causes him to experience a worsening of any of these symptoms.
76. In reviewing all the evidence, the opinions of Drs. Andrew and Boatright concerning the evaluation of permanent disability and range of motion are given more weight than the opinions expressed by Drs. Schofield and Mintzer.
77. Because of his injury, Plaintiff was not able to play at his full capacity and at the skill level necessary to make the Panthers team or any other professional football team, and his earning capacity has greatly diminished.
78. The Plaintiff eventually became employed outside of the NFL as a GEICO insurance agent. His initial base salary was $30,000.00 per year, plus commission. In 2007, his gross earnings, with commissions, were $59,572.68.
79. As a result of the workplace accident of August 2005, Plaintiff sustained an injury to his right thumb which caused ongoing pain and called for the necessity of medical treatment, including surgery. All medical treatment, with the exception of Dr. Andrew's evaluation, has been paid for by the Defendants. *Page 16 
80. A reasonable inference from the facts is that, but for the Plaintiff's injury, the Plaintiff would have played for the Carolina Panthers during the contract year and his average weekly wage should be been based on earnings of $305,000.00.
81. Exceptional reasons exist for using the method for calculating Plaintiff's average weekly wage that will most accurately approximate the amount which the injured employee would be earning were it not for the injury. Specifically, at the time of the injury giving rise to this claim, the Plaintiff had not been employed by the Defendants for a fifty-two week period and use of the other methods of calculating the average weekly wage are not appropriate, and it would be unfair to use his training camp wages; nor has any credible evidence been presented by the Defendants to support any method other than the last method under N.C. Gen. Stat. § 97-2(5). Therefore, it is appropriate to resort to such other method of computing average weekly wages as will most nearly approximate the amount which the injured employee would be earning were it not for the injury. Accordingly, his average weekly wage is $5,865.38.
82. Since his injury, the most money Plaintiff has been able to earn is $59,572.68 in 2007 for a post-injury average weekly wage of $1,145.63.
83. As a result of his injury, the difference in Plaintiff's average weekly wage is $4,719.75 per week.
84. Two-thirds of this difference is $3,146.66 per week, which is well in excess of the $704.00 maximum amount allowed in 2005.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW *Page 17 
1. In August 2005, Plaintiff sustained an admittedly compensable injury by accident arising out of and in the course and scope of his employment. This accident caused his twenty percent (20%) permanent partial disability and he is entitled to medical compensation and disability benefits. N.C. Gen. Stat. §§ 97-2(19); 97-25, 97-30; 97-31.
2. The method which would "most nearly approximate the amount which the injured employee would be earning were it not for the injury" would be the contract amount of $305,000.00, divided by 52 weeks, yielding an average weekly wage of $5,865.38. Hendricks v. Hill Realty Group/KeyRisk, 131 N.C. App. 859, 509 S.E.2d 801 (1998); Larramore v. RichardsonSports Ltd. Partners, 353 N.C. 520, 546 S.E.2d 87 (2001).
3. The Plaintiff has been permanently partially disabled and is entitled to compensation, subject to the credit below, for the period from August 13, 2005 (the date of injury) to the present and continuing for a total of 300 weeks at the maximum compensation rate of $704.00 per week, representing two-thirds of the difference between his average weekly wage pre-injury ($5,865.38) and his average weekly wage post-injury ($1,145.63) which is his more munificent remedy pursuant to N.C. Gen. Stat. § 97-30; Gupton v. Builders Transport, 320 N.C. 38,357 S.E.2d 336 (1987); Britt v. Gator Wood Inc. ___ N.C.App. ____648 S.E.2d 917 (2007).
4. Defendants are entitled to deduct 16.5 weekly compensation payments at the maximum applicable rate of $704.00 weekly from the 300 weeks of compensation otherwise due and owing, pursuant to the stipulated NFL Collective Bargaining Agreement.
5. Plaintiff's counsel is entitled to an attorney fee for valuable services rendered in obtaining the medical and disability compensation for Plaintiff as set forth herein and this amount is to be deducted from the total amount awarded, before the NFL credit is deducted. N.C. Gen. Stat. § 97-90. *Page 18 
6. Dr. Andrew's bill of $850.00 for an independent evaluation to determine disability, pursuant to N.C. Gen. Stat. § 97-27(b), is reasonable and is approved. N.C. Gen. Stat. § 97-90(a).
 ***********
Based on the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay on behalf of Plaintiff all medical compensation incurred as a result of his August 2005 injury, including the cost of the evaluation by Wallace Andrew, M.D.
2. The Plaintiff, Marcus Floyd, shall receive compensation benefits in the amount of $704.00 per week, for 300 weeks from August 13, 2005 until fully paid, subject to attorney fees, and thereafter subject to a credit of 16.5 weeks, pursuant to the stipulated NFL Collective Bargaining Agreement. Interest from the date of the hearing will be added to the award before any credit is taken. N.C. Gen. Stat. § 97-86.2.
3. The fee contract submitted by Plaintiff's counsel is approved as reasonable. Attorney's fees in the amount of 25% will be deducted from the total amount awarded (before the credit is deducted). For the purpose of determining attorney's fees, interest shall not be included in the calculation since interest goes exclusively to the Plaintiff. These fees shall be paid directly to Plaintiff's counsel, Leonard T. Jernigan, Jr. In the event total fees have not accrued, then every fourth check will be deducted and sent directly to Leonard T. Jernigan, Jr. for the value of legal services rendered. N.C. Gen. Stat. § 97-90(c).
4. Defendants shall pay Marcus Floyd $850.00 as reimbursement for the cost of the examination by Dr. Andrew. *Page 19 
5. Defendants shall pay the entire cost of this action.
This the 25th day of November.
 S/___________________
 DANNY LEE McDONALD
 COMMISSIONER
CONCURRING:
 S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
DISSENTING:
 S/___________________ DIANNE C. SELLERS COMMISSIONER *Page 20