***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Gillen and the briefs and arguments before the Full Commission. The appealing party has shown good grounds to reconsider the evidence, and upon reconsideration, the Full Commission REVERSES the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS *Page 2 
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employment relationship existed between plaintiff and defendant-employer during August 2005.
3. Plaintiff's last date of employment with defendant-employer was September 3, 2005.
4. Defendants do not dispute that plaintiff sustained a compensable injury by accident to his left shoulder while making a tackle during a professional football game on August 20, 2005.
5. No disability benefits have been paid to date.
6. On March 12, 2007, counsel for plaintiff requested authorization from defendants for plaintiff to be seen by Dr. Kevin Speer for an evaluation. Counsel for defendants responded to that request by denying authorization for plaintiff to see Dr. Speer, instead suggesting that plaintiff could return to Dr. Patrick Connor for an evaluation. Plaintiff did not choose to be seen by Dr. Connor and instead sought treatment on his own with Dr. Speer.
7. Berkley Regional Insurance Company was the carrier on the risk for defendant-employer.
8. The following were stipulated into evidence at the Deputy Commissioner's hearing as:
 a. The Pre-Trial Agreement marked as stipulated exhibit 1.
 b. A compilation of Industrial Commission Forms, discovery responses, plaintiff's wage records, plaintiff's medical records, defendant-employer's personnel file, collectively paginated 1-249, marked as stipulated exhibit 2. *Page 3 
 c. A tape containing video evidence of plaintiff's play in a pre-season game against the Washington Redskins on August 13, 2005, marked as stipulated exhibit 3.
 d. A tape containing video evidence of plaintiff's play in a pre-season game against the New York Giants on August 20, 2005, marked as stipulated exhibit 4.
 e. A tape containing video evidence of plaintiff's play in a pre-season game against the Cleveland Browns on August 26, 2005, marked as stipulated exhibit 5.
 f. A tape containing video evidence of plaintiff's play in a pre-season game against the Pittsburgh Steelers on September 1, 2005, marked as stipulated exhibit 6.
 g. An additional compilation of documents containing Industrial Commission Orders, Industrial Commission Forms, and revised discovery responses, collectively paginated 1-13, marked as stipulated exhibit 7.
10. The issues before the Commission are to what workers' compensation disability benefits and/or additional medical treatment is plaintiff entitled, if any, as a result of his August 2005 shoulder injury; and, whether the deposition testimony of Dr. Patrick Connor should be stricken from the record for alleged Salaam violations (Salaam v. NorthCarolina Dept. of Transp., 122 N.C. App. 83, 468 S.E.2d 536 (1996).
 ***********
Based upon all of the competent evidence adduced from the record, the Full Commission makes the following: *Page 4 
 FINDINGS OF FACT
1. Plaintiff was born on January 22, 1979. Plaintiff has a Bachelor's Degree in Social Work and a Master's Degree in Education. Plaintiff received these degrees from the University of Pittsburgh. Plaintiff played football for the University of Pittsburgh from 1997 through 2001. He was awarded the CBS Player of the Year award in 2000 and was a 2001 finalist for the Lombardi Award, which is annually presented to the nation's top lineman.
2. While playing football for the University of Pittsburgh, plaintiff was diagnosed with a SLAP (superior labrum anterior and posterior) II lesion of the left shoulder. The lesion was limited to the superior labrum and there was "no propagation into the biceps tendon." There were no tendonopathy, partial tears or full thickness tears of the left shoulder and the long head of the biceps appeared normal. No further treatment was recommended for plaintiff and he continued to play football for the University of Pittsburgh.
3. Plaintiff was drafted by the Chicago Bears in 2001. An orthopedic evaluation of plaintiff in 2002 showed no problems with his left shoulder. Plaintiff played football for the Chicago Bears from April 2002 through September 2004. He started on special teams in 2002 and as linebacker in 2003. His starting salary was $225,000.00 and he later signed a contract for $380,000.00 per year.
4. Due to a change in team management, plaintiff's contract with the Bears was not renewed in 2004. After being cut by the Bears prior to the 2004 regular season, plaintiff unsuccessfully tried out for other NFL teams.
5. In January 2005, plaintiff underwent a health evaluation prior to signing a contract with defendant-employer. The health evaluation showed that plaintiff's AC joint, rotator cuff strength and shoulder instability were all within normal limits. His contract with the Carolina *Page 5 
Panthers provided that plaintiff would be a linebacker for the 2005 season with a starting salary of $380,000.00. This contract anticipated that plaintiff would attend defendant-employer's training camp prior to the 2005 season and attempt to make the team. Plaintiff's contract was not guaranteed, in that if he did not make the team he would not be paid a salary during the regular season. Plaintiff was one of several players competing for one or two open linebacker spots.
6. Plaintiff attended defendant-employer's training camp held in South Carolina prior to the 2005 season. As with all NFL teams, almost twice as many players are invited to participate in training camp than can make the final roster.
7. Plaintiff contends and the Commission finds that on August 16, 2005, plaintiff injured his left shoulder during a training-camp practice when he was hit on the shoulder. Plaintiff informed an athletic trainer about the injury and was told that the shoulder was probably bruised. The trainer recommended icing the shoulder and no further treatment.
8. Defendants contend that plaintiff first suffered the left shoulder injury during a pre-season game against the New York Giants held on August 20, 2005. Defendants contend that plaintiff first reported the injury on August 21, 2005 to Ryan Vermilion, head athletic trainer for the Carolina Panthers, as happening in the previous day's game.
9. Plaintiff's left shoulder was also evaluated by Dr. Patrick Connor, the team physician, on August 21, 2005. After the orthopedic evaluation, plaintiff was diagnosed with a left shoulder contusion and grade 1 AC sprain. Plaintiff was referred for routine treatments with the team trainers and was told to participate in activities as tolerated. Dr. Connor did not feel that plaintiff's examination on August 21, 2005 revealed any evidence of a problem severe enough to warrant plaintiff's having any restrictions from playing football. The grade 1 AC sprain, a very *Page 6 
common football injury, typically results in soreness for a few weeks, but normally does not limit a football player's activities or playing ability.
10. Mr. Vermilion made a pad for plaintiff to wear on his left shoulder during practices and games. Following plaintiff's injury, he participated in two practice sessions per day. On August 22, 2005, plaintiff told another athletic trainer, Reggie Scott, that he felt better in comparison to the day prior. An examination showed increased range of motion without pain. Plaintiff was reporting no problems or complaints. Mr. Scott suggested continued treatment that consisted of hot and cold packs, massage, and range of motion exercises.
11. Plaintiff followed up with Mr. Vermilion on August 24, 2005, reporting that his pain was improving. Plaintiff continued to practice while having shoulder pain. He experienced significant pain when he moved his arm laterally, to the left and backwards. He was told by the trainers to continue with range of motion and modality treatments and to wear the AC pad for practice. Plaintiff played in pre-season games, although he felt that he was only able to play at 70% of his normal capacity.
12. Plaintiff played in a pre-season game against the Cleveland Browns on August 26, 2005. On August 27, 2005, plaintiff saw Mr. Vermilion and Dr. Connor for an evaluation. Plaintiff indicated that he did well and had no complaints during the previous day's game. His examination was normal, but Dr. Connor noted that horizontal movements caused some pain to plaintiff's left shoulder. Plaintiff was told to continue with treatments and to pad his left shoulder joint during all contact activities. Dr. Connor testified that it was normal for a football player to "play through" this type of injury without "any sequela." Dr. Connor did not see plaintiff again and did not check to see if the horizontal movements continued to cause plaintiff pain. *Page 7 
13. Plaintiff continued to practice and received hot and cold packs, massages, and ultrasound treatments on August 28, 29, 30, and 31 and September 2, 2005. Plaintiff was repeatedly told by the trainers and Dr. Connor that his injury was not serious, that he only needed some "rest and rehab," and that his shoulder pain would improve without further treatment.
14. On September 1, 2005, plaintiff played in a pre-season game against the Pittsburgh Steelers. The following day plaintiff reported some post-game soreness of the shoulder to Mr. Vermilion and received treatment and ice on the shoulder.
15. On September 3, 2005, the day before his $380,000.00 contract came into effect, plaintiff was released from the team by defendant-employer for unsatisfactory performance as compared with the other players. Because of his injury, plaintiff was unable to play at his full capacity and at the skill level necessary to make the team.
16. On September 3, 2005, Mr. Vermillion performed an exit physical of plaintiff and indicated plaintiff was able to play football. Mr. Vermillion did not list any injuries on the form and no orthopedic examination was performed to determine any horizontal limitations plaintiff had. Based on the medical opinions given by the trainer and Dr. Connor, plaintiff did not pursue an injury grievance against defendant-employer within the allotted 60-day time period, as he was led to believe his injury was a minor, temporary condition.
17. Following his release from the Panthers, plaintiff continued to rest and do limited workouts to give his shoulder a chance to heal. Plaintiff was able to bench press 90 pound dumb bells because pressing forward was not a problem, but he was unable to do 90 pounds doing butterflies or extensions. Pre-injury, plaintiff was able to lift up to 415 pounds.
18. After approximately three months of rest, in December 2005, plaintiff tried out for the Detroit Lions. He underwent an approximately 15-minute physical examination by the Lions *Page 8 
team physician, Dr. Kyle Anderson. Among the purposes of this examination was to assess plaintiff's physical status to determine if plaintiff had an injury or condition that would impact his on-field performance.
19. Prior to the Lions examination, plaintiff filled out a health history questionnaire that specifically asked him to disclose any prior injuries. Plaintiff did not disclose his August 2005 shoulder injury in the questionnaire or to Dr. Anderson. In his testimony at the Deputy Commissioner's hearing, plaintiff explained that he did not mention the shoulder injury because he had been informed by Panthers staff that his injury was minor. He stated that in professional football, players do not list every minor injury when trying out for a team.
20. Dr. Anderson testified that his examination of plaintiff revealed that plaintiff's shoulders had full motion without any apprehension or labral signs, that plaintiff had full rotator cuff strength, and that plaintiff was in acceptable condition to play professional football. However, plaintiff was not offered a contract with the Detroit Lions.
21. In December 2005, plaintiff obtained employment with ChildCare Network as the director of the school. Later, he worked for Smart Business and then Wells Fargo, where his base pay was $33,000.00 plus commissions. His total income for 2006 was $37,316.58. Plaintiff continued to experience left shoulder soreness and pain.
22. Because plaintiff had not experienced any relief of his pain symptoms for a year, he filed a Form 18 in this claim on July 6, 2006. Defendants filed a Form 61 dated August 3, 2006, admitting that plaintiff suffered a compensable injury to his left shoulder during the August 20, 2005 preseason game, but denying that plaintiff sustained any disability as a result.
23. Plaintiff asked for additional medical treatment in 2007. Defendants authorized him to return for a visit with his treating physician, Dr. Connor. Plaintiff did not return to Dr. *Page 9 
Connor but instead met with Dr. Kevin Speer, an orthopedic physician in Raleigh who specializes in treatment of shoulders. Dr. Speer diagnosed plaintiff with an aggravation of a superior labral tear. Even though plaintiff had normal range of motion in his left shoulder, he had tenderness in the anterosuperior joint line.
24. Plaintiff was sent by Dr. Speer for a new MR arthrogram, which showed an irregular anterior superior labral injury with instability features on external rotation. The persistence of shoulder pain, coupled with plaintiff's history of a pre-existing SLAP lesion, indicated to Dr. Speer that plaintiff had a re-tear of his superior labrum.
25. On May 29, 2007, Dr. Speer recommended that plaintiff undergo an arthroscopic superior labral repair. Plaintiff underwent this surgery on July 27, 2007. During the surgery Dr. Speer observed in plaintiff's left shoulder a superior labral tear, a loose piece of cartilage, and a tear of the biceps tendon. According to Dr. Speer, these injuries would have interfered with a player's ability to play professional football. Dr. Speer stated and the Full Commission finds that the pre-existing SLAP lesion from 1999 was aggravated by the August 2005 injury and that the biceps tendon tear was caused by the August 2005 injury. Since the surgery, plaintiff's pain has diminished significantly.
26. As the result of the injury by accident on August 16, 2005, plaintiff sustained a 10% permanent functional impairment to his left shoulder.
27. On November 9, 2007, defendants obtained an independent medical evaluation/records review by Dr. Joseph Estwanik regarding the causation of plaintiff's 2007 condition. Dr. Estwanik reviewed plaintiff's medical records and MRI films, but did not evaluate plaintiff in person. It was Dr. Estwanik's opinion that plaintiff's August 2005 injury was not causally related to his 2007 shoulder problems. *Page 10 
28. Dr. Connor, the Panthers' team physician and plaintiff's initial treating doctor, testified that based on his evaluation of plaintiff in August 2005 and his review of plaintiff's medical records, including the IME report by Dr. Estwanik, plaintiff's shoulder condition in 2007 was unrelated to the injury plaintiff sustained in August 2005. According to Dr. Connor, in August 2005 plaintiff had no symptoms of a labral or biceps tendon tear.
29. Defendants made a motion to the Deputy Commissioner to be allowed to submit medical records, including Dr. Estwanik's IME report, to Dr. Connor in advance of his deposition. Plaintiff objected, arguing that to allow defense counsel to have direct contact with plaintiff's physician constituted a Salaam violation and would allow defendants to potentially taint the physician's testimony. By Order filed September 26, 2007, Deputy Commissioner Gillen allowed defendants to send all medical records, without any comments or directions, to Dr. Connor. At Dr. Connor's deposition, he stated that he reviewed the IME report and made notes. Therefore, plaintiff's counsel moved to strike the deposition and did not cross-examine Dr. Connor. The Full Commission finds that the submission of the IME report to Dr. Connor did not constitute impermissible Salaam contact and declines to strike Dr. Connor's deposition.
30. Having considered the testimony of Dr. Estwanik, Dr. Connor, Dr. Anderson, and Dr. Speer regarding the causation of plaintiff's 2007 shoulder condition, along with their relative expertise and the circumstances of their involvement with plaintiff's treatment, the Full Commission gives greater weight to the testimony and expert opinions of Dr. Speer than to Dr. Connor, Dr. Anderson and Dr. Estwanik.
31. The Commission finds that plaintiff's left shoulder condition and resulting surgery by Dr. Speer to repair the biceps tendon tear and the SLAP lesion were causally related to the work-related injury of August 16, 2005. *Page 11 
32. A reasonable inference from the facts is that but for plaintiff's injury, plaintiff would have played for the Panthers during the contract year and his average weekly wage should be based on earnings of $380,000.00, which computes to an average weekly wage of $7,307.69.
33. As the result of the compensable injury by accident, plaintiff was partially disabled from employment and earned reduced wages when he returned to employment in December 2005. His diminished ability to earn wages is due to his disability resulting from the compensable injury by accident.
34. Since plaintiff left the Panthers, he earned $37,316.00 in 2006, which yields a post-injury average weekly wage of $717.62.
 ***********
Based on the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. On August 16, 2005, plaintiff sustained an injury by accident to his left shoulder arising out of and in the course of his employment with defendant-employer. N.C. Gen. Stat. § 97-2(6).
2. As the result of the compensable injury, plaintiff sustained a 10% permanent functional impairment to his left shoulder for which he is entitled to receive permanent partial disability compensation for 24 weeks. N.C. Gen. Stat. § 97-31(13).
3. As the result of the compensable injury, plaintiff was partially disabled and is entitled to partial disability compensation for 300 weeks dating from August 16, 2005, the date of his injury by accident, at the rate of $704.00 per week, the maximum rate in effect during the year 2005. N.C. Gen. Stat. § 97-30; Larramore v. Richardson Sports Ltd.Partners, *Page 12 141 N.C. App. 250, 540 S.E.2d 768 (2000), aff'd per curiam, 353 N.C. 520,546 S.E.2d 87 (2001). Payment of plaintiff's partial disability is his more munificent remedy. Gupton v. Builders Transport, 320 N.C. 38,357 S.E.2d 336 (1987).
4. Exceptional reasons exist for using the method used herein for calculating plaintiff's average weekly wage that most accurately approximates the amount which plaintiff would be earning were it not for the injury he sustained. N.C. Gen. Stat. § 97-2(5). Plaintiff's average weekly wage should be determined from the amount he would have earned if he had continued to play football for defendants. Larramore v.Richardson Sports Ltd. Partners, supra.
5. Plaintiff is entitled to all medical expenses incurred or to be incurred as a result of his compensable injury of August 2005, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or tend to lessen plaintiff's period of disability. N.C. Gen. Stat. §§ 97-2(19); 97-25.
 ***********
Based on the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to the attorney's fee awarded below, defendants shall pay plaintiff partial disability compensation at the maximum compensation rate of $704.00 per week in effect during the year 2005 for a period of 300 weeks, beginning August 16, 2005, the date of his injury by accident. Any amount that has accrued shall be paid to plaintiff in a lump sum.
2. Defendants shall pay all related medical expenses incurred or to be incurred by plaintiff as the result of his injury by accident, for so long as such examinations, evaluations and *Page 13 
treatments may reasonably be required to effect a cure, give relief or tend to lessen plaintiff's period of disability.
3. A reasonable attorney fee of 25% of the compensation due plaintiff under paragraph 1 of this Award is approved for plaintiff's counsel and shall be paid directly to plaintiff's counsel. Thereafter, every fourth compensation check shall be paid directly to plaintiff's counsel.
4. Defendants shall pay the costs.
This the 23 day of December, 2008.
 S/_________________________
 LAURA KRANIFELD MAVRETIC
 COMMISSIONER
CONCURRING:
 S/_________________________ PAMELA T. YOUNG CHAIR
 S/_________________________ BUCK LATTIMORE COMMISSIONER *Page 1